631 So.2d 127 (1993)
In the Matter of the ESTATE OF Dewey D. HOLLAWAY, Deceased.
Mattie Hollaway and Guy Hollaway, Individually and as Administrator De Bonis Non Cum Testamento Annexo
v.
Lee T. HOLLAWAY and Betty Jean Hollaway Hawkins.
No. 90-CA-143.
Supreme Court of Mississippi.
December 23, 1993.
*128 Rhett R. Russell, Timmons Randle & Russell, John R. Coleman, Tupelo, for appellant.
David R. Sparks, Sparks Wicker & Colburn, Tupelo, for appellee.
En Banc.
PITTMAN, Justice, for the Court:
This case comes to this Court for the second time on appeal. Mattie K. Hollaway sued two of her step-children contesting her late husband's will and seeking an accounting, recovery of estate property, and equitable relief. The trial court found that certain instruments, a promissory note and certificates of deposit, were not part of the decedent's estate and not subject to Mattie Hollaway's elective share. On appeal this Court reversed the finding of the chancellor, remanding for a finding as to what, if any, portion of the certificates of deposit were the property of the decedent. On remand the trial court found that Betty Jean Hollaway Hawkins was in contempt of court for failing to turn over assets belonging to her late father's estate and granted a judgment against her. The court refused to extend the contempt judgment to include Lee T. Hollaway, but did remove him as executor of his father's estate. Mattie Hollaway and her son, Guy, now serving as administrator of his late father's estate, appeal the trial court's ruling, alleging the following as error:
I. Whether the Chancery Court of Lee County, Mississippi, should have awarded monetary judgment in favor of the estate of the decedent against Lee T. Hollaway for the losses suffered by the estate (computed to be $38,154.47 as of the 25th day of May, 1989, plus attorney fees and interest) which proximately resulted from his breaches of statutory and other fiduciary duties while serving as executor?

*129 II. Should the lower court have found Lee T. Hollaway to be in civil contempt of court for his wilful breaches of fiduciary duties and his disobeyance of directives and orders of the lower court?

III. Should the lower court have found Lee T. Hollaway and Betty Jean Hollaway Hawkins to be in civil contempt of court for their wilful failure to comply with directives of the subpoena duces tecum duly served upon each of them?
IV. Should the value of the homestead right of Mrs. Mattie Hollaway as widow as to the residence she shared with the decedent as of his demise be calculated and considered as a part of her separate estate for the purposes of determining and reducing the value of her statutory share of the net assets of the estate resulting from her election against decedent's will: and should the lower court have acted correctly, whether or not the "homestead" value should be equated to that value of a "life estate" and computed by utilization of the U.S. Internal Revenue Service's annuity table formulated for the valuation of a life estate interest in property for federal estate and gift tax purposes?
Lee T. Hollaway and Betty Jean Hollaway Hawkins raise the following issue on cross-appeal:
I. Whether the chancellor erred in finding Betty Jean Hollaway Hawkins in contempt of court, and in awarding a judgment of $38,154.47 against her?

FACTS AND PROCEDURAL HISTORY
Dewey D. Hollaway died on October 22, 1982, leaving his widow, Mattie K. Hollaway, and four children: Lee T. Hollaway, Betty Jean Hollaway Hawkins, Douglas D. Hollaway, and Guy Hollaway. Mattie Hollaway was the second wife of Dewey Hollaway and the mother of Guy Hollaway. Further factual background of this appeal may be found in the first appeal of this case to this Court, Matter of Estate of Holloway,[1] 515 So.2d 1217, 1219-20 (Miss. 1987) (hereinafter Holloway I):
Mattie K. Holloway initially filed a complaint seeking a widow's allowance. She also renounced her share under decedent's will and filed a complaint contesting decedent's will and seeking an accounting, recovery of estate property, and equitable relief.
... .
Decedent left a will which was admitted to probate by decree entered November 30, 1982. The will named as executor Lee Holloway, decedent's son. Letters testamentary were duly entered. Decedent devised to Mattie K. Holloway a life estate in the couple's homestead property only so long as she lived on it and used it solely as a residence. The remainder of his property, both real and personal, was to be sold and the proceeds distributed among Mattie and his children; however, Mattie would get her share only if she continued to live on the homestead property.
Douglas Holloway sought an accounting and inventory of the estate assets. The executor filed an inventory listing the homestead as the estate's only real property. Decedent had no other bank accounts outside a joint checking account with Mattie Holloway. Household items and furnishings were owned jointly by decedent and Mattie.
The only other items listed in the inventory were three certificates of deposit and a promissory note with accompanying deed of trust. The C.D.'s were made payable to decedent Or Betty Holloway Hawkins Or Lee T. Holloway Or Guy Holloway. One C.D. was for $16,000 and the other two C.D.'s were for $10,000 each.
To avoid confusion, it should be made clear at this juncture that $4,000 in cash was added to the $16,000 C.D. at renewal in order to create the two $10,000 C.D.'s existing at decedent's death.
The only other significant item in the inventory was a promissory note. Decedent sold some real estate to Joe M. Allen and wife and Charles Lee and wife in *130 March 1976. The four executed a promissory note for $20,200 payable to Dewey D. Holloway (decedent) or Lee T. Holloway, payable $120 per month for five years and $100 per month for the remaining 10 years.
On October 27, 1982, five days after her father's death, Betty Jean Hollaway Hawkins redeemed the two certificates of deposit at the Bank of Mississippi, receiving a check for $20,000.00. She took the funds and purchased two new certificates of deposit at the Citizens Bank of Tupelo. She listed only herself and her brother, Lee T. Hollaway, as payees on the certificates.
Ten to twelve months after the death of Dewey Hollaway, Joe M. Allen paid Lee Hollaway $9,100.00 in satisfaction of the balance of the note he had had with Dewey Hollaway. These funds were first placed in the escrow account of Lee Hollaway's attorney, and then in Lee Hollaway's personal account.
In September of 1985, the trial court found that the certificates and the promissory note were not part of Dewey Hollaway's estate. It further refused to remove Lee T. Hollaway as executor, and denied Mattie Hollaway's claim for widow's support. Mattie Hollaway appealed to this Court. While the appeal was pending, Betty Jean Hollaway Hawkins, in July 1987, closed out the account at Citizens Bank. She received two checks, one for $5,136.11 and one for $5,136.12, with the balance of the $20,000.00 in cash.
We reversed the holding of the chancery court, finding that the certificates of deposit were part of Dewey D. Hollaway's estate, with the remaining question on remand being the portion of the certificates which had been contributed to by the decedent. We further found that the chancery court erred in failing to remove Lee T. Hollaway as executor.
The mandate in Holloway I was issued on December 12, 1987. By judgment dated April 12, 1988, Lee T. Hollaway was removed as the executor of his father's estate. The chancery court at that time appointed Julian Riley, Lee County Chancery Clerk, Administrator de bonis non with the will annexed. A subsequent judgment, dated May 5, 1988, directed Lee T. Hollaway to present his inventory and final accounting as executor of his late father's estate, and to deliver possession and control of any assets of the estate to Julian Riley. Lee Hollaway's final inventory, dated May 12, 1988, and executed by him, listed various items of personal property as well as real property located in Lee County, Mississippi. As to the certificates of deposit in question, the inventory stated that until a hearing was held no determination could be made as to what portion of the certificates, if any, may have belonged to Dewey Hollaway and would be part of his estate; however, Hollaway went on to say in the inventory that he was "of the belief that these Certificates of Deposit [were] not part of the Estate."
On June 27, 1988, the chancery court, in accordance with the decision in Holloway I, held a hearing to determine who had contributed to the funds represented by the two certificates of deposit in question. Betty Jean Hollaway Hawkins testified that her father had contributed $80.00 toward the purchase of the certificates, and she had contributed the rest. She claimed that this money came from her checking and savings accounts. Her father had given her money at various times but she had no idea how much. This conflicted with Mrs. Hawkins' previous deposition testimony that she could not remember how much she and her father had contributed toward the certificates. Mrs. Hawkins took Guy Hollaway's name off the certificates because she claimed her father told her that Guy was not to be trusted. Mrs. Hawkins could express no opinion as to her husband's salary while he served in the Air Force; his retirement benefits; their monthly expenses; and how long she had worked during their marriage. She did say that her husband had retired from the Air Force in 1971, and, since that time, had done some carpentry and painting work. She was able to say that she and her husband owned their home, more than one automobile, a boat, and had sent their four children through school. Mrs. Hawkins admitted that she had taken the funds she had received after redemption of the certificates in cash and had spent them. The funds had gone to pay her "general living expense," and she had also loaned, or given, a portion of the *131 funds to her children. She did not consult with her lawyer or Lee Hollaway before spending the funds. She denied that Lee Hollaway had ever, during his term as executor, asked her to hand over the certificates or funds or had even inquired as to their whereabouts.
Guy Hollaway, son of Dewey Hollaway by Mattie Hollaway, testified that the purpose of the certificates of deposit was to ensure that Mattie Hollaway would be taken care of in case she needed money. Guy was not present when the certificates were purchased. Guy stated that the funds used to purchase the certificates came from proceeds from the sale of two pieces of Dewey Hollaway's property, $3,000.00 that Dewey Hollaway had saved, and $9,000.00 remaining in Dewey Hollaway's account in a failed savings and loan.
Lee T. Hollaway, the original executor of Dewey Hollaway's estate, testified that he had no knowledge of whose funds were used to purchase the certificates of deposit in question. He did know that Betty Jean Hollaway Hawkins had taken the certificates and had them reissued with only their two names on them. He had no knowledge as to what had happened to the certificates, and never made any inquiry with his sister Betty or anyone else as to their whereabouts, and had never attempted to take possession of them. Lee stated that he acted on the advice of counsel when he made his decisions as executor. He acknowledged that he filed no tax returns on behalf of his late father's estate. Rather, he included income from the estate on his individual return, and paid taxes on that, as the funds in question were in his name. He claimed that he had expended $4,632.00 in funds on behalf of the estate, and asked the court for reimbursement of $2,419.28, but he had failed to consult with the court before making these expenditures. The parties were able to stipulate that Mattie Hollaway was entitled to a widow's allowance for one year totalling $6,500.00.
The chancery court rendered its opinion in this matter on February 16, 1989. It found that "all payments due by virtue of the `Allen' note are the sole property of the Estate of Dewey Hollaway. Likewise, it is the opinion and the finding of this Court that all funds represented by the certificate of deposit constitute assets of the estate." The court found "no substantial or believable evidence" that anyone other than Dewey Hollaway had provided funds for the purchase of the certificates of deposit in question. The court ordered that Betty Jean Hollaway Hawkins, Lee T. Hollaway, "or any persons acting in concert with them" immediately deliver the funds represented by the certificates of deposit, and the Allen note, with interest, to Julian Riley.
In May 1989 the chancery court required Betty Jean Hollaway Hawkins and Lee T. Hollaway to show cause as to why they should not be held in contempt for failing to turn over assets of the estate. Lee Hollaway testified that he had, on September 6, 1988, turned over $11,693.73, the proceeds plus interest from the Allen note, to Julian Riley. He had no other assets from the estate nor was he aware of any. Betty Jean Hollaway Hawkins testified that she had no funds belonging to her late father's estate to turn over to the court because she had spent them all. She made no further effort to retrieve any of the funds in question. The court found that Betty Jean Hollaway Hawkins was in contempt of court and rendered a judgment against her in the amount of $38,154.47, that being the principal sum of $20,000.00 as represented by the two certificates of deposit in question plus interest. The court declined to find Lee T. Hollaway in contempt or liable for any damages. The court ultimately found the following:
The value of Mrs. Mattie Hollaway's homestead rights as to the residence she shared with the decedent as of his demise should be determined and considered as part of her separate Estate for the purposes of determining whether or not her child's share of the Estate resulting from her election against decedent's Will should be diminished. The value of Mattie Hollaway's homestead rights to such real property should be computed in accordance with the Annuity Table utilized by the Internal Revenue Service as of decedent's demise for determining the value of life estates in real property for U.S. Estate *132 and Gift taxation. Mattie was 70 years of age as of the date of death of the decedent with the applicable factor depicted on the IRS Annuity Table for determining the value of a life estate of a female of such age for gift and estate tax purposes being.47540. Thus, at the $40,000.00 fair market value of the residential real property of decedent as of the date of his death, $19,016.00 (.47540 x $40,000.00) is deemed to be the value at such time of Mrs. Hollaway's homestead rights in and to such real property and said value shall be includable as said widow's separate Estate in the computation of determining her forced share resulting from her election against the will of the decedent herein. The value of the Estate of the deceased for purposes of determining his widow's elective share shall include the value of the Promissory Note and Certificates of Deposit in question as well as accrued interest thereon as of decedent's death as well as the value of decedent's real property at such time. Though the judgment awarded by this Court against Betty Jean Hollaway Hawkins on the 25th of May, 1989, is an asset of the Estate, such value shall not be considered as an asset of the Estate for purposes of determining and computing the widow's elective share.
Mattie and Guy Hollaway appeal, and Lee Hollaway and Betty Jean Hollaway Hawkins cross-appeal, from the trial court's judgment.

DISCUSSION

I.
Lee T. Hollaway and Betty Jean Hollaway Hawkins asserted on cross-appeal that the trial court erred in finding Betty Jean Hollaway Hawkins in contempt, and in awarding $38,154.47 against her. We find no merit in this assignment of error. We stated the following on the issue of civil contempt in Caldwell v. Caldwell, 579 So.2d 543, 545 (Miss. 1991):
The burden of proof in a case of civil contempt is by a preponderance of the evidence. Miss. Code Ann. § 11-51-12(4) (Supp. 1990). "The factual findings of the chancery court in a civil contempt case are affirmed unless manifest error is present and apparent." Premeaux v. Smith, 569 So.2d 681, 683 (Miss. 1990).
"The law is well settled that upon establishment of a prima facie case of contempt, the defendant may avoid judgment of contempt by establishing that he is without present ability to discharge his obligation, but he has the burden of proving his inability to pay, and such a showing must be made with particularity and not in general terms." Jones v. Hargrove, 516 So.2d 1354, 1357 (Miss. 1987). Before one may be found in contempt of a court judgment, the judgment must be "complete within itself  containing no extraneous references, leaving open no matter or description or designation out of which contention may arise as to the meaning." Wing v. Wing, 549 So.2d 944, 947 (Miss. 1989). The behavior necessary for a finding of contempt must amount to a willful or deliberate violation of a judgment or decree. Dunaway v. Busbin, 498 So.2d 1218, 1222 (Miss. 1986).
Betty Hawkins argues first that her uncontradicted testimony that she was the source of the funds making up the certificates of deposit, except for the $80.00 contributed by her father, should have been accepted by the court as true. She relies on several cases for essentially the same proposition, stated as follows in Hearin-Miller Transporters, Inc. v. Currie, 248 So.2d 451, 454 (Miss. 1971) (quoting Ryals v. Douglas, 205 Miss. 695, 722, 39 So.2d 311, 317 (1949)):
The rule is that the testimony of a witness which is uncontradicted, and who is not impeached in some manner known to the law, where he is not contradicted by the circumstances, must be accepted as true. It is true that the direct evidence of a witness may be contradicted by circumstances, but in such case the circumstances relied on for contradiction must be inconsistent with the truth of the testimony. `When the testimony of a witness is not contradicted, either by direct evidence or by circumstances, it must be taken as true.'
While the aforementioned rule is a valid proposition of law, it is also true that *133 uncontradicted testimony may be so improbable and incomplete under the circumstances of the case as to be bereft of credibility. See Hill v. United Timber & Lumber Co., 68 So.2d 420, 426-27 (Miss. 1953). It is also well-established that the witness' credibility is for the trial court to determine. The chancellor obviously believed that Betty Hawkins spent approximately $20,000.00 well after she had been given ample notice that the ownership of that money was a matter of legal controversy and the issue might someday be decided against her. When she was ordered to produce the funds, she made no effort to collect any portion of it from persons she had given or loaned the money to. It is clear that the chancellor acted well within his authority in holding Betty Jean Hollaway Hawkins in contempt of court and in rendering judgment against her in the amount previously stated. Therefore, this assignment of error is without merit.

II.
Since assignments of error I and II are so closely related, the Court will address both at the same time. Mattie Hollaway and Guy Hollaway alleged that the trial court erred in refusing to extend the contempt judgment rendered against Betty Jean Hollaway to Lee T. Hollaway, who acted as executor of his late father's estate until 1988. At the core of this issue are the rights and duties of executors, and whether Lee Hollaway failed in his responsibilities so as to render him liable to his late father's estate.
The rights and duties of an executor are specifically stated in Miss. Code Ann. § 91-7-47 (1972), which provides:
Every executor or administrator with the will annexed, who has qualified, shall have the right to the possession of all the personal estate of the deceased, unless otherwise directed in the will; and he shall take all proper steps to acquire possession of any part thereof that may be withheld from him, and shall manage the same for the best interest of those concerned, consistently with the will, and according to law. He shall have the proper appraisements made, return true and complete inventories except as otherwise provided by law, shall collect all debts due the estate as speedily as may be, pay all debts that may be due from it which are properly probated and registered, so far as the means in his hands will allow, shall settle his accounts as often as the law may require, pay all the legacies and bequests as far as the estate may be sufficient, and shall well and truly execute the will if the law permit. He shall also have a right to the possession of the real estate so far as may be necessary to execute the will, and may have proper remedy therefor.
These duties are further explained in Harper v. Harper, 491 So.2d 189, 193-94 (Miss. 1986):
Duties of an executor have been outlined further in the case law of Yeates v. Box, 198 Miss. 602, 22 So.2d 411 (1945), wherein this Court stated the executor's duties are "(1) to reduce to possession the personal assets of the testator; (2) to pay the testator's debts; (3) to pay legacies; and (4) to distribute the surplus to the parties entitled thereto." Powers granted an executor are coextensive with the will and therein grounded. Ricks v. Johnson, 134 Miss. 676, 99 So. 142 (1924); Grant v. Spann, 34 Miss. 294 (1857).
The duly appointed executor shall carry out all of the provisions of the will that may be lawful. The will is the source and measure of the power of the executor. Ricks, 99 So. at 146. And in determining the powers of executors, the basis for all construction of language within the will is to determine first the intention of the testator as gathered from the whole will. Yeates v. Box, 198 Miss. at 602, 22 So.2d at 411.
One serving in the capacity of executor or administrator is an officer of the Court and holds a fiduciary relationship to all parties having an interest in the estate. A trust arises from the appointment of the executor or administrator. Schreiner v. Cincinnati Altenheim, 61 Ohio App. 344, 22 N.E.2d 587 (1939); 33 C.J.S., Executors and Administrators, § 3, p. 878 (1942).
Thus in answering questions of the powers, duties, and liabilities of executors, this Court applies the above Mississippi statutory *134 and case law, as well as the expressed intent of the testamentary instrument itself.
In answering these questions this Court must establish a standard of care chargeable to an executor in evaluating charges of maladministration. It appears proper that since a trust and fiduciary relationship is established by these connections, this Court holds that the same standard of care applicable to a general trustee applies to an executor or administrator. This standard is expressed as follows:
Ordinary care, skill, and prudence are normally required of trustees in the performance of all their duties, unless the trust instrument provides otherwise. The rule is "that trustees are bound in the management of all the matters of the trust to act in good faith and employ such vigilance, sagacity, diligence and prudence as in general prudent [persons] of discretion and intelligence in like matters employ in their own affairs. The law does not hold a trustee, acting in accord with such rule, responsible for errors of judgment." "All that equity requires from trustees is common skill, common prudence, and common caution." [Footnotes omitted]
Bogert, Law of Trusts, § 93 (5th ed. 1973). See also, Scott, Scott on Trusts, § 174 (3rd ed. 1967).
"[Executors and administrators] are not required to exercise any higher skill and prudence than that which is imposed upon any other agent or trustee; they are not insurors or guarantors." New York Indemnity Co. v. Myers, 161 Miss. 784, 793, 138 So. 334, 336 (1931). The executor is also required to file an accounting at least once a year, showing the disbursements and receipts of estate. Miss. Code Ann. § 91-7-277 (1972). This accounting may be waived by the testator through the will. Will of McCaffrey v. Fortenberry, 592 So.2d 52, 65 (Miss. 1991). However, the chancery court may require an accounting even when the testator has waived it where there are charges of mismanagement or maladministration of the estate. Harper, 491 So.2d at 200.
Appellants relied primarily on Kelly v. Shoemake, 460 So.2d 811 (Miss. 1984). Gayle Kelly rendered various services for his aunt and uncle, the Windhams, during their later years. Once Mr. Windham died, Kelly continued to render services to Mrs. Windham, as well as serving as her business manager. Eventually Kelly was named by Mrs. Windham as executor of her estate; Kelly also became joint tenant on Mrs. Windham's bank accounts and on her certificates of deposit. Kelly subsequently made substantial withdrawals from the accounts, and eventually claimed that the Windhams had promised him their entire fortune. Kelly was eventually removed as executor, and a judgment of $1,194,972.39 awarded against him for failure to account for and return missing funds to the Windham estate. This Court affirmed, relying on Miss. Code Ann. § 91-7-253 and § 91-7-285. More recently, in Will of McCaffrey v. Fortenberry, 592 So.2d 52 (Miss. 1991), we identified an executor's failure to obtain court approval before sale of real property under Miss. Code Ann. § 91-7-187, failure to file an inventory under Miss. Code Ann. § 91-7-93, failure to file an estate tax return under Miss. Code Ann. § 27-7-35, and payment of unapproved attorney's fees as consistent with maladministration of an estate. We affirmed a surcharge against Mr. Fortenberry, the executor in question, of $90,360.00 in unapproved attorney's fees.
Dewey Hollaway's will waived both the requirement of a bond for his executor and the requirement that his executor file annual accountings. Lee Hollaway argued that he relied on advice of counsel for everything he did as executor. We stated, in Ladner v. Ladner, 206 So.2d 620, 623 (Miss. 1968), "that where a contemnor defendant claims that he was acting upon the advice of counsel in violation of a solemn decree of the chancery court, this is no defense to a proceeding for contempt, although such fact may be taken into consideration by the chancellor in mitigation of the offense."
In the case sub judice, Lee Hollaway's actions as the executor did not measure up to the standard of prudence, caution and trust required of him as executor.
*135 From 1982 forward, Lee Hollaway knew that the ownership of the funds represented by the Certificates of Deposit were a matter of legal dispute.
Lee Hollaway knew that the Certificates of Deposit had been renewed on September 21, 1982, one month prior to the death of Dewey D. Hollaway, and that the C.D.'s were payable to Dewey D. Hollaway (decedent) or Betty Hollaway Hawkins or Lee T. Hollaway or Guy H. Hollaway. Lee T. Hollaway knew that on October 27, 1982, only days after the death of Dewey D. Hollaway, that these Certificates were redeemed at the Bank of Mississippi, that a check in the amount of $20,000 was issued to Betty Jean Hollaway Hawkins, that this $20,000 was reinvested in C.D.'s with a value of $20,000 at the Citizens Bank with Betty Jean Hollaway Hawkins and Lee T. Hollaway named as the payees. Lee T. Hollaway knew, not later than November 30, 1982, that the will of the decedent was admitted to probate wherein Lee T. Hollaway was named as the executor of the estate and that this money remained in the Citizens Bank until withdrawn by Betty Jean Hollaway Hawkins in July 1987. Presumably, from October 27, 1982 until July 1987 the C.D.'s remained at the Citizen's Bank in the name of Betty Jean Hollaway Hawkins and Lee T. Hollaway. From the time between October 27, 1982 and until July 1987, Lee T. Hollaway had access to, or possession of, the money thereby effectively controlling the money and at the same time, he was serving as the executor of the estate. His possession of the C.D.'s and claim to the proceeds represented by the C.D.'s was the possession and claim he exercised as the executor until he was removed as said executor by the lower court. Lee T. Hollaway not only did not collect and safeguard the assets of the estate, he was, from the time of appointment as executor until July 1987, in possession of the $20,000 in C.D.'s and he possessed them for the estate and he allowed that possession to be dissipated or terminated without protest or without legal action to protect the assets of the estate. The statute requires more of an executor and if after having gained possession the executor releases that possession, he does so at his own peril and, in the case sub judice, as a co-contemnor. One who is in a fiduciary relationship, as is an executor, owes the fiduciary a high duty of care. Further, Lee T. Hollaway was removed as executor of the estate and when so removed assets of the estate which had been at least partially under his control and in his possession were no longer in possession of the estate or available to the estate. Lee T. Hollaway's conduct rises to the level of civil contempt of the court below.
Largely due to his inaction, his father's estate has been deprived of a substantial sum of money. We find that the lower court's judgment should be reversed, and that Lee T. Hollaway should be found in contempt of court and jointly and severally liable with his sister, Betty Jean Hollaway Hawkins, for the sum of $38,154.47.

III.
Appellants also ask that Lee Hollaway and Betty Jean Hollaway Hawkins be held in contempt for failure to respond to certain subpoenas. Because the appellees have been found to be in contempt on other grounds, we decline to address this issue.

IV.
The final issue herein is the appellants' claim that the trial court erred in considering Mattie Hollaway's homestead rights as part of her separate estate for purposes of determining and reducing the value of her statutory share of the net assets of the estate resulting from her election against her husband's will. As we agree with the position taken by the appellants, we do not address the second aspect of the appellants' assignment which argues that, even if the trial court was correct in considering Mattie Hollaway's homestead rights as part of her separate estate, it erred in equating the value of the homestead right with the value of a life estate.
In the case at bar, the house was held solely in the name of Dewey Hollaway. In his will, Dewey Hollaway devised to Mattie Hollaway a life estate in this homestead property only so long as she lived on it and used it solely as a residence. The remainder of his property, both real and personal, was *136 to be sold and the proceeds distributed among Mattie Hollaway and his children, contingent upon Mattie Hollaway's continued residence on the homestead property. However, Mattie Hollaway renounced this will and elected to take a child's share pursuant to Miss. Code Ann. § 91-5-25.
In determining Mattie Hollaway's separate estate for purposes of reducing her statutory share, the chancellor held that her homestead right was to be included as an asset of her separate estate. In calculating the value of such homestead right, the chancellor stated in his judgment of September 5, 1989:
The value of Mrs. Mattie Hollaway's homestead rights as to the residence she shared with the decedent as of his demise should be determined and considered as part of her separate Estate for the purposes of determining whether or not her child's share of the estate resulting from her election against decedent's Will should be diminished. The value of Mattie Hollaway's homestead rights to such real property should be computed in accordance with the Annuity Table utilized by the Internal Revenue Service as of decedent's demise for determining the value of life estates in real property for U.S. Estate and Gift taxation. Mattie Hollaway was 70 years of age as of the date of death of the decedent with the applicable factor depicted on the IRS Annuity Table for determining the value of a life estate of a female of such age for gift and estate tax purposes being.47540. Thus, at the $40,000.00 fair market value of the residential real property of decedent as of the date of his death, $19,016.00 (.47540 x $40,000.00) is deemed to be the value at such time of Mrs. Hollaway's homestead rights in and to such real property and said value shall be includable as said widow's separate estate in the computation of determining her forced share resulting from her election against the will of the decedent herein.
In calculating the widow's separate estate, the chancellor correctly found that the homestead right of Mattie Hollaway had some value. However, the question is not whether the homestead right has value, as it certainly does, but whether this value should be included in the widow's separate estate for purposes of calculating the statutory share of the estate she receives for electing to renounce her husband's will. Two cases are relevant in deciding the answer to this question  Williams v. Williams, 111 Miss. 129, 71 So. 300 (1916) and Milton v. Milton, 193 Miss. 563, 10 So.2d 175 (1942).
In Williams, 111 Miss. 129, 71 So. 300 (1916), a widow excepted to the report of a sale of the homestead made by the executor of the deceased. The widow renounced the will within the statutory time period and elected to take her inheritance in accordance with the appropriate statute. In affirming the lower court's vacating of the sale and award to the widow of a child's share of the estate, we held:
There is no contention that the widow in this case has a separate estate, and her rights, therefore, are fixed by section 5086, Code of 1906 (now § 91-5-25). Under this section the widow is not only awarded a child's part of the estate in the instant case, but enjoys such statutory rights as are given her by the laws of decent and distribution. So far as her rights are concerned, there is no will. She is accorded the statutory right to renounce the will and thereby brush aside the instrument of writing by which the rights of the other devisees are measured. In thus electing to take an heir's portion of the estate, she inherits by decent an undivided interest in the homestead, which, under the express provisions of the statute, "shall not be subjected to partition or sale for partition during her widowhood, as long as it is occupied or used by the widow, unless she consent." [Emphasis supplied].
Williams, 111 Miss. at 131, 71 So. at 302.
In Milton v. Milton, 193 Miss. 563, 10 So.2d 175 (1942), the decedent devised to his wife, Lynn Milton, a life estate in the home they shared at the time of his death with the remainder to one of his two daughters, Gloria Lee Milton. The wife renounced the will and demanded a child's share. In affirming the chancellor's apportionment of the ownership interest of the home, we stated:
From this, it follows that the court below correctly held, ... (2) that the place occupied *137 by the testator as his home at his death passed, under the will, to his widow and Gloria L. Milton; but because of the renunciation of the will by his widow she became entitled to a one-third interest to the property in fee; and Gloria Lee Milton to the other two-thirds interest therein, subject to Mrs. Lynn Milton's right under Section 1412, Code of 1930, (now § 91-1-23), to occupy and use it during her widowhood.
Milton, 193 Miss. at 565, 10 So.2d at 177.
In the case at bar, Mattie Hollaway renounced the will of her husband. At that point in time, insofar as her rights were concerned, there was no will. Williams v. Williams, 111 Miss. 129, 131, 71 So. 300, 302 (1916). Thus, she was entitled to share in the estate through the laws of intestate succession. Mattie Hollaway was entitled to a one-fifth interest in fee in the homestead. The children were entitled to a four-fifths interest in the house, subject to the homestead rights of Mattie Hollaway. Milton v. Milton, 193 Miss. 563, 565, 10 So.2d 175, 177 (1942). The same logic applies to the C.D.s and the funds realized from the promissory note  Mattie Hollaway should have taken a one-fifth share of these funds through intestate succession with the remaining four-fifths to the children. Of course, Mattie Hollaway's share of the estate was and is subject to reduction by the value of her separate estate.
The valuation of Mattie Hollaway's separate estate is wherein the problem lies. The chancellor valued Mattie Hollaway's homestead right as that of a life estate and assigned it a value of $19,016.00 in accordance with an annuity table utilized by the Internal Revenue Service. The chancellor included this figure as part of the assets of Mattie Hollaway's separate estate. The result was that Mattie Hollaway was not entitled to share in the estate, her separate estate being larger than the share she would receive through intestate succession.
"The net value of a surviving spouse's separate estate is ascertained by totaling the value of all property owned by the surviving spouse at the death of his spouse and by deducting therefrom the debts of the surviving spouse." Robert A. Weems, Wills and Administration of Estates in Mississippi, § 6-7; see, e.g., Banks v. Junk, 264 So.2d 387 (Miss. 1972). Clearly, Mattie Hollaway's homestead right was not property owned by her at the time of her husband's death. This right accrued to Mattie Hollaway as the result of her husband's death and the renunciation of his will. The homestead right was improperly included as part of Mattie Hollaway's separate estate for purposes of reducing her statutory share of the estate.
To hold otherwise would be to narrow the homestead rights of a widow whereas this Court has traditionally taken the opposite course and liberally construed the homestead right of a widow. As we stated in Dickerson v. Leslie, 94 Miss. 627, 47 So. 659 (1908):
No higher claim under the law can be propounded than the right of the widow to claim her homestead rights. No statute ever passed has a greater claim upon the court for liberal construction than this. The statute undertakes to carry out that duty which the dead husband owed to this wife, and to compel by law the duty which affection should prompt the children to freely concede.
Id. 47 So. at 660.
This is particularly true herein. If Mattie Hollaway's homestead right is valued as a life estate and considered part of her separate estate, she would not be entitled to a statutory share since her separate estate would exceed the value of her elective share. Mattie Hollaway would face a Hobson's choice between her homestead right and her elective share of Dewey Hollaway's estate  in order to claim her elective share she would have to renounce her homestead right while, on the other hand, claiming her homestead right would result in the loss of her elective share. This is not a decision that a widow should be forced to make. We, therefore, hold that the chancellor erred in including the value of Mattie Hollaway's homestead right as part of her separate estate for purposes of reducing her statutory share.
Accordingly, we reverse and remand for proceedings not inconsistent with the opinion of this court.
REVERSED AND REMANDED.
*138 HAWKINS, C.J., PRATHER, P.J., and SULLIVAN and SMITH, JJ., concur.
DAN M. LEE, P.J., dissents with separate written opinion joined by BANKS, McRAE and JAMES L. ROBERTS, Jr., JJ.
DAN M. LEE, Presiding Justice, dissenting:
I concur with the majority opinion insofar as it relates to Betty Jean Hollaway Hawkins. I believe, however, that the majority incorrectly holds "that Lee T. Hollaway should be found in contempt of court and jointly and severally liable with his sister, Betty Jean Hollaway Hawkins, for the sum of $38,154.47." For the reasons stated below, I cannot agree with this conclusion. I find no fault with the majority's explication of the duties of executors. It is the application of those relatively straightforward concepts to the facts of this specific case with which I must take exception.

I. FACTS.
Dewey Hollaway died on October 22, 1982. He was survived by Mattie Hollaway, his widow, and four children. Lee Hollaway, Betty Hollaway Hawkins, and Douglas D. Hollaway are Dewey's children by a previous marriage. Guy Hollaway is the son of both Dewey and Mattie. Dewey's estate consisted primarily of funds represented by a promissory note (the Allen note described at length in the majority opinion, with a face value of $20,200) and two C.D.s (valued at $20,000).
The facts related to the acquisition of the first C.D. are unclear. It appears, however, that the first C.D. (valued at $10,000) was purchased on September 17, 1979 with the payees listed as Betty Hawkins, Lee Hollaway, and Guy Hollaway. This C.D. was renewed in March and September of 1980, in the same amount with the same payees listed. On March 20, 1981, however, the amount of the C.D. was increased to $15,000 and Dewey Hollaway's name was added as an alternative payee; this remained true with subsequent renewals. In September, 1981, the C.D. was renewed but was increased by $1000 for a total of $16,000.
On March 8, 1982, Dewey Hollaway cashed a $4,200 check written on his and Mattie Hollaway's joint account. On March 20, 1982, the amount of the C.D. was increased to $20,000 by the purchase of two $10,000 C.D.s. Betty Hawkins testified that she could not remember where she acquired the $4,000 used to increase the total amount of the C.D.s to $20,000. These C.D.s were again renewed on September 21, 1982, one month prior to the death of Dewey Hollaway.
On October 27, 1982, five days after her father's death, Betty Hawkins redeemed these C.D.s at the Bank of Mississippi, receiving a check for $20,000. This money was used to buy $20,000 in new C.D.s at the Citizens Bank. However, Betty Hawkins listed only she and her brother, Lee Hollaway, as payees, dropping Guy Hollaway and Dewey Hollaway. This money remained in the Citizens Bank until withdrawn by Betty Hawkins in July, 1987.
The promissory note, executed by Joe Allen on March 19, 1976, payable in favor of Dewey Hollaway, with Lee Hollaway as alternate payee, resulted from a sale of land. The face value was $20,200, payable in 60 installments of $120 per month beginning on May 1, 1976. Thereafter, the payments were reduced to $100 per month for 120 months. Payments were made to Dewey Hollaway until his death and thereafter to Lee Hollaway. Ten to twelve months after Dewey Hollaway's death, Joe Allen paid Lee Hollaway $9,100 as satisfaction of the balance of the note. The funds were deposited in an escrow account of Dewey Hollaway's attorney and were later transferred to Lee Hollaway's personal account. The funds remained in Lee Hollaway's personal account until it was turned over to Julian Riley, the next succeeding executor of the estate, on September 6, 1988, with interest.
The C.D.s matured several months after the death of Dewey Hollaway. On September 25, 1985, the Chancery Court of Lee County entered its judgment that neither the C.D.s nor the promissory note were part of the estate and denied the widow's objection to the accounting and a request to have Lee Hollaway removed as executor. The plaintiffs *139 subsequently appealed, without supersedeas, to this Court.
On July 28, 1987 (subsequent to the July 15, 1987, oral argument) Betty Hawkins cashed the C.D.s at Citizens Bank, received two checks, one for $5,136.11 and one for $5,136.12, and the remainder of the $20,000.00 in cash. Betty Hawkins subsequently disposed of these funds.
Subsequent to Betty Hawkins' withdrawal of the funds represented by the C.D.s, this Court entered its unanimous opinion on November 25, 1987, reversing, holding that the C.D.s and promissory note were both part of the estate of Dewey D. Hollaway, and remanding to determine the amount, if any, contributed by the decedent and Betty Hawkins towards the purchase of the C.D.s. Further, this Court held that Lee Hollaway's position as executor presented a conflict of interest and the chancellor was directed to appoint a new executor.
On April 14, 1988, Lee Hollaway was removed as executor and letters of administration de bonis non cum testamento annexo were issued to Julian Riley, the Lee County Chancery Clerk. Guy Hollaway was later substituted as successor fiduciary. The lower court directed Lee Hollaway to present his final inventory and to deliver to the successor fiduciary, on or before May 13, 1988, all assets of the estate in his possession or control.
During the proceedings which followed, the chancellor held that all funds represented by the promissory note and C.D.s in question, plus accrued interest thereon, constituted assets of the estate. The lower court ordered Betty Hawkins, Lee Hollaway, or any person acting in concert with them, to immediately deliver to Julian Riley, administrator de bonis non cum testamento annexo, all funds represented by the C.D.s, plus accrued interest thereon, and the promissory note and all monies received thereunder, plus accrued interest. On September 6, 1988, Lee Hollaway fully complied with the order by delivering unto Julian Riley the sum of $11,693.73, representing the balance of the Allen promissory note and accrued interest thereon. However, no funds for the C.D.s were tendered by Betty Hawkins.
On April 19, 1989, subpoenas duces tecum were individually served on Lee Hollaway and Betty Hawkins, requiring each of them to produce the funds represented by or derived from the C.D.s, documents applicable to investment or reinvestment of such funds, income tax returns and other pertinent documents. On April 27, 1989, Lee Hollaway and Betty Hawkins moved the court to quash the subpoenas. No hearing was ever had thereon. The funds or documents were required to be produced at the hearing scheduled on May 4, 1989, to determine whether Betty Hawkins and Lee Hollaway should be held in contempt of court for failure to turn over estate assets in compliance with the chancellor's orders. Such hearing was rescheduled for May 12, 1989.
Testimony by Betty Hawkins revealed that she had spent the money from the C.D.s between July, 1987, and June, 1988. She used this money for "general living expenses." During this period, the $20,000 was not held in a bank and was evidently kept in her home and/or on her person. At various times subsequent to her father's death, she spent all interest income from the $20,000 principal amount of the C.D.s for her personal expenses, thus renewing only the principal amounts. Subsequent to the initial appeal of this matter, Betty Hawkins, with the principal amount of these investments, gifted part of the money to her adult children, loaned one or two thousand dollars to one adult child (without requiring a promissory note or like instrument of indebtedness), and spent the balance of the funds on general living expenses and other things. Betty Hawkins received no receipts, could not remember her largest expenditure, could not recall any major item that she had purchased with the money in question, nor remember any particular transaction and could produce no documentary evidence of any transaction.
Betty Hawkins made no effort whatsoever to comply with the chancellor's order. She did not attempt to get any funds back to either the court, or the substitute fiduciary, made no effort to recover and turn over such funds and did not tender her personal funds to either the court or the substitute fiduciary.
*140 At the close of the contempt hearing, the chancellor found:
Betty Jean Hollaway Hawkins stated under oath that she made periodic withdrawals of interest amounts as such accrued on such Certificate of Deposit funds subsequent to the decedent's demise, subsequently withdrew in cash the principal amount represented by such Certificates and now has transferred all of such funds by "ordinary living expenditures", gifts to her adult children and loans to her adult children. Since this Court's Order of the 28th day of February, 1989, Betty Jean Hollaway Hawkins has neither made any efforts to pay over to the present fiduciary any funds whatsoever and should be adjudged in civil contempt of this Court with the present fiduciary granted judgment in favor of the estate of and from her in the principal amount of $20,000.00 plus pre-judgment interest from the 21st day of September, 1982, at the rate depicted on such Certificates of Deposit being 9.693 percent compounded biannually to date of judgment and post-judgment interest of all of which thereafter at the legal rate.
However, the lower court refused to declare Lee Hollaway in contempt of court for failing to comply with the subpoenas duces tecum or to award judgment in favor of the estate against Lee Hollaway for losses resulting from his alleged breaches of duty as executor.

II. LAW AND ANALYSIS.
As stated above, I do not take issue with the majority's recitation of the various duties placed on executors by our statutes and cases. As I studied the spectrum of duties catalogued in the majority opinion, however, I found no case or statute that imposes on an executor the absolute duty to procure items that have been determined by an appropriate court not to be property of the estate. An executor must use ordinary care and skill in determining what items are property of the estate. Lee Hollaway did so. He listed the C.D.s on an inventory submitted to the Chancery Court and thereafter abided by that Court's decision.
There was a time, prior to April, 1988, when Lee Hollaway was the executor of his father's estate subject to all the fiduciary responsibilities set out in the majority's opinion. With the ruling of the lower court in February, 1989, there came a time when Lee Hollaway knew or should have known that the C.D.s were entirely the property of his father's estate. Had these two time periods overlapped, Lee Hollaway's duty would clearly have been to attempt to procure the certificates. However, they did not.
The earliest possible notice that Lee Hollaway had that the C.D.s might be estate property came when the opinion issued from this Court (from this writer) in Holloway I, on November 25, 1987. Assuming, arguendo, that Lee's fiduciary duty required him to act at that time, he still would have been too late to prevent his sister's appropriation of the money. She in fact took possession of the cash on July 28, 1987.
In my opinion, Lee Hollaway cannot be said to have violated his fiduciary duty to the beneficiaries of his father's estate by not demanding property that had been judicially determined to be outside the estate. Accordingly, I would affirm the lower court on this point.
As for the majority's holding on contempt of court, I am somewhat at a loss to understand how Lee Hollaway acted in contempt of court. He never defied any court order before, during, or after his tenure as executor.
The lower court expressly declined to hold Lee Hollaway in contempt:
Until this Court finally decided, and gave its opinion, Mr. Lee T. Hollaway had the perfect right to take the position that he did, in my opinion.
His intent to comply with appropriate court direction was evidenced by the following statements taken from his testimony during the June 27, 1988, trial:
Q. Has any of the funds represented by those certificates of deposit as they existed as of your dad's demise, has any of that come into your hands?
A. No, sir.

*141 Q. Have you demanded that your sister, or anybody else, turn those funds over to you individually or in your fiduciary capacity?
A. No, sir. When I first turned this will over for probate to Jak Smith, the lawyer, I asked him to let the court decide on this matter. So, I never have made any efforts one way or the other since then.
Q. But when you were serving as administrator, executor or whatever fiduciary capacity, you didn't demand these funds be turned over?
A. No, I didn't demand it. I asked the court to decide what happened to it.

Lee T. Hollaway at all times expressed a willingness and desire to act in compliance with all court orders and directives. However, until almost a year after he was removed as executor, there was never a determination by this Court or any other that the certificates of deposit in question were in toto assets of the estate. Furthermore, the appeal was taken without supersedeas, a simple matter which could have prevented the dissipation of the assets. In my opinion, the failure of the appellants in Holloway I to obtain an appeal with supersedeas, rather than any conduct on Lee Hollaway's part, allowed Betty Hawkins to spend the money. By not seeking an appeal with supersedeas, the appellants took the risk that Betty Jean Hollaway Hawkins might spend the money. That is in fact what happened.
Thus, we are left with the facts that Lee Hollaway gathered all the assets of his father's estate, in compliance with the September 25, 1985, judgment of the lower court, that he released no assets improperly, and that he violated no court orders. These facts can only support one conclusion, that the lower court committed no error by when it held that Lee T. Hollaway had not breached his fiduciary duties and was not in contempt of court. Accordingly, I would affirm.
BANKS, McRAE and JAMES L. ROBERTS, Jr., JJ., join this opinion.
NOTES
[1] It was determined after "Holloway I" was handed down in 1987 that the correct spelling is "Hollaway."